## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF NORTH CAROLINA
## CHARLOTTE DIVISION

AVADIS AVADIS; TOTAL
SOLUTIONS PROPERTY
MANAGEMENT, LLC; AA TOTAL
SOLUTIONS, LLC,

          **Plaintiffs,**

v.

SOUHEIL ANTHONY AZAR;
JALAL JOHN AZAR; RON BATES;
ASHLEY ADAMS; MACC VENTURE
PARTNERS, LLC; CAPSTONE
MULTI-FAMILY GROUP, LLC;
WENDOVER INVESTORS, LLC;
WENDOVER MANAGEMENT, LLC;
WW INVESTORS, LLC; GREEN
MANOR INVESTORS, LLC; GREEN
MANOR MANAGERS, LLC;
FALCON POINTE INVESTORS,
LLC; FALCON POINTE
MANAGERS, LLC; ROCKWALL
COMMONS, LLC; ROCKWALL
COMMONS FOUNDER, LLC;
SOUTHERN PINES APARTMENTS,
LLC; KINGSWOOD FINANCIAL;
FAST EXPRESS MART, LLC;
GASTON PORTFOLIO INVESTORS,
LLC; TRIPOINT DIAGNOSTIC,
PLLC; MAY AZAR, M.D.; GARRON
J. SOLOMON, M.D.; and ROBIN
KIRBY, M.D.,

          **Defendants.**

CASE NO. _____

**COMPLAINT
(JURY TRIAL DEMANDED)**

Plaintiffs, for their Complaint, allege that each Defendant has violated the

Federal Racketeer Influenced and Corrupt Organization Act ("RICO"), 18 U.S.C §§

1961-68, which provides for a private civil action to recover treble damages by any

1

person injured in his business or property by reason of a violation of 18 U.S.C. § 1962, which prohibits conducting or participating in the conduct of an "enterprise," "through a pattern of racketeering activity." Plaintiffs further allege as follows:

## I.

## INTRODUCTION

1. This action arises from a fraud perpetrated by Defendant Souheil Anthony Azar (hereafter "Tony Azar") and each other Defendant, who organized, created, and operated multiple limited liability companies – buying and selling multi-family real estate assets – for the specific purpose of defrauding all three Plaintiffs, beginning in 2012 and continuing consistently through 2021.

2. These limited liability companies formed an "Enterprise," which consisted of a formal group of people associated in fact and for the common purpose of engaging in a course of conduct to defraud the Plaintiffs of their property through a pattern of racketeering activities.

3. Defendants' conspiracy to defraud the Plaintiffs was discovered in 2019 when they retained the services of professionals to investigate Tony Azar, his Co-Defendants, their Enterprise, and its criminal activities.

4. Defendants' fraudulent offers to Plaintiffs to invest, their subsequent concealments, manipulations, dilutions and disappearances of legitimate investments by the Plaintiffs, were carried out by initial invitations by telephone, in-person meetings and by numerous e-mails with promises of precise and set percentage ownerships and gains for Plaintiffs, only to be changed – sometimes

2

immediately and sometimes during the course of the Enterprise – by manipulating the LLC's operating agreements, by emails, by forgeries, by introducing laundered funds, all to the injury of Plaintiffs' businesses and their properties.

5. The pattern of racketeering activity was established by Defendants' criminal use of electronic communications, *i.e.*, via telephone, wire and mail fraud, forgeries and money laundering and violations of the North Carolina General Statutes.

6. Defendant Tony Azar as the head and creator of this racketeering enterprise, has engaged from at least 2012, and continues to engage to the present, in a pattern of racketeering activity, with the direct and/or indirect assistance of each and all Defendants, as more thoroughly explained below. By using state limited liability companies, Tony Azar, and Defendants and others to be known, created the Enterprise, advanced the racketeering activities, and proximately caused the injury to Plaintiffs' businesses and properties and affected interstate and foreign commerce.

## II.

## **JURISDICTION AND VENUE**

7. This Court has original subject-matter jurisdiction pursuant to 18 U.S.C. § 1964(c) and 28 U.S.C. § 1331 because this action arises, in part, under RICO, which is a federal law.

8. This Court has also subject-matter jurisdiction pursuant to 28 U.S.C. § 1332 because the amount in controversy exceeds $75,000.00, exclusive of interest and

3

costs and is between citizens of different states and citizens of a state or subjects of a foreign state.

9. The parties' citizenship is completely diverse pursuant to 28 U.S.C. § 1332.

10. There are two sources of venue in this Court:

(a) A substantial part of the events or omissions giving rise to the action occurred in this district, pursuant to 28 U.S.C. § 1391(a)(2).

(b) Defendant Tony Azar, and his Defendant companies and employees, have their principal places of business in North Carolina, pursuant to 28 U.S.C. § 1391(a)(2).

11. This Court has jurisdiction over Plaintiffs' related state and common law claims pursuant to the doctrine of supplemental jurisdiction, 28 U.S.C. §1367(a).

## III.

## **THE PARTIES**

12. Plaintiff Avadis Avadis ("Avadis") is an individual and a citizen of Florida.

13. Plaintiff Total Solutions Property Management, LLC ("TSPM") is a North Carolina Limited Liability Company and a citizen of Florida because Plaintiff AA Total Solutions, LLC is its sole member and a citizen of Florida.

14. Plaintiff AA Total Solutions, LLC ("AATS") is a Florida Limited Liability Company and a citizen of Florida.

4

15.     Defendant Tony Azar is an individual and a citizen of North Carolina. He is the CEO and the person in control of all the limited liability companies created and operated by him and other Defendants since the year 2012, which include family members, a Vice President and a CFO, and assistant managers, employees, and others. He is also the individual, together with the other Defendants, who through criminal predicate acts defrauded the Plaintiffs using emails, mail, telephone, forgeries, in-person contacts and money laundering.

16.     Defendant Jalal John Azar ("John Azar") is an individual and a citizen of North Carolina. He is Defendant Tony Azar's brother, a Vice President of MACC Venture Partners, LLC, and directs company logistics, development, and investments for Tony Azar. Without him, Tony Azar could not alone have managed his criminal Enterprise.

17.     Defendant Ron Bates ("Bates") is an individual and a citizen of North Carolina. He is the Company Chief Financial Officer, a Certified Public Accountant who has served with and under Tony Azar for eleven years and who manages all the accounting, taxes, and the operations of his limited liability companies and without whom Tony Azar could not have been able to administratively manage and operate the LLCs, the Enterprise and the racketeering activities.

18.     Defendant Ashley Adams is an individual and a citizen of North Carolina. She is the daughter of Tony Azar and functions as the Director of Asset Management to her father. Without her, he would not be able to administer the acquisition of real estate assets. As a Notary Public, she has notarized mortgage

5

deeds and other documents, and, directly or indirectly, she has advanced the Enterprise and its racketeering activities.

19.     Related party, Maggie Munell, is an individual and a citizen of North Carolina. She is the daughter of Tony Azar and functions as an Investment Director to her father. Without her, Tony Azar would not be able to manage the Enterprise. She directly and indirectly has contributed to the advancement of the Enterprise and its racketeering activities.

20.     Related party, Chrissy Howard, is an individual and a citizen of North Carolina. She is the daughter of Tony Azar and his Director of Financial Operations, who, directly or indirectly, has participated and advanced the purposes of the Enterprise and its racketeering activities.

21.     Defendant MACC Venture Partners, LLC ("MACC") is a North Carolina Limited Liability Company and a citizen of North Carolina. This LLC is the principal management company and the headquarters for Tony Azar, located at 245 West Main Street, Gastonia, North Carolina, and of his codefendants, that functions as the main office for the Enterprise. It controls and manages all the affairs of the Enterprise and its racketeering activities.

22.     Defendant Capstone Multifamily Group, LLC ("Capstone") is a North Carolina Limited Liability Company and a citizen of North Carolina. This LLC was used by Tony Azar and Defendants, as part of their Enterprise to manage and receive contributions and issue distributions to the Plaintiffs, thus advancing the scheme to defraud Plaintiffs.

6

23.     Defendant Wendover Investors, LLC ("Wendover") is a North Carolina Limited Liability Company and a citizen of North Carolina. This LLC was created by Defendants to receive contributions or investments from the Plaintiffs and was used to promote the Enterprise's scheme to defraud Plaintiffs.

24.     Defendant Wendover Management, LLC ("W. Management") is a North Carolina Limited Liability Company and a citizen of North Carolina. This LLC was used by Tony Azar and Defendants to manage the affairs of Wendover and to promote and advance their Enterprise and racketeering activities.

25.     Defendant WW Investors, LLC ("WW Investors") is a North Carolina Limited Liability Company and a citizen of North Carolina. This LLC was used by Defendants to promote and advance their illegal Enterprise to defraud Plaintiffs.

26.     Defendant Green Manor, LLC ("Green Manor") is a North Carolina Limited Liability Company and a citizen of North Carolina. This LLC was created and used to advance its Enterprise and its racketeering activities.

27.     Defendant Green Manor Managers, LLC ("Green Manor Managers") is a North Carolina Limited Liability Company and a citizen of North Carolina. As well, it is an LLC created and used by Defendants to manage, promote, and advance their Enterprise to defraud Plaintiffs through racketeering activities.

28.     Defendant Falcon Pointe Investors, LLC ("Falcon Pointe Investors") is a North Carolina Limited Liability Company and a citizen of North Carolina. This LLC was created and used by Defendants to receive contributions from Plaintiffs and to promote its Enterprise and their scheme to defraud the Plaintiffs.

7

29. Defendant Falcon Pointe Managers, LLC ("Falcon Managers") is a North Carolina Limited Liability Company and a citizen of North Carolina. This LLC was created and used by Tony Azar and Defendants to manage, advance, and promote its Enterprise and defraud Plaintiffs.

30. Defendant Rockwall Commons, LLC ("Rockwall Commons") is a Texas Limited Liability Company and a citizen of North Carolina. It was formed by Rockwell Commons Founder, LLC, and used by Tony Azar, to receive the loan funds contributed by Plaintiff Avadis, originally invested for the purchase of an office building in Texas.

31. Defendant Rockwall Commons Founder, LLC ("Rockwall Founder") is a Texas limited liability company and a citizen of North Carolina. It was formed by Ibanez LP, and Bowman Investment Group, LLC, on information and belief, to specifically manage the loan funds invested by Plaintiff Avadis to purchase the medical building in Texas, and to further assist defendants and their Enterprise to scheme and defraud Plaintiff Avadis of his money.

32. Defendant Southern Pines Apartment, LLC ("Southern Pines") is a South Carolina Limited Liability Company and a citizen of South Carolina. It was created and operated by Bowman Investment Group, LLC, on information and belief, to further promote and advance the Enterprise through racketeering activities.

33. Defendant Kingswood Financial ("Kingswood") was neither registered nor recognized by the State, nor a legitimate company, but invented by Tony Azar,

8

Bates, its CFO, and directly or indirectly by Defendants, in North Carolina, to further promote and advance their Enterprise and their scheme to defraud Avadis.

34.     Defendant Fast Express Mart, LLC ("Fast Express Mart") is a North Carolina Limited Liability Company and a citizen of North Carolina. This was an existing LLC offered to Plaintiffs by Tony Azar and Defendants, as a bargain purchase of a gas station and convenience store that turned into another vehicle to defraud Plaintiff Avadis of his money, and to advance their Enterprise and their scheme to defraud Avadis.

35.     Defendant Gaston Portfolio, LLC ("Gaston Portfolio") is a North Carolina Limited Liability Company and a citizen of North Carolina. This LLC was also created, owned and managed by Defendants with the specific intention of defrauding Plaintiffs.

36.     Defendant Tripoint Diagnostic, PLLC ("Tripoint") is a North Carolina Professional Limited Liability Company and a citizen of North Carolina. It was created in 2014 by Dr. Garron J. Solomon to run his medical business. Later, on information and belief, Defendants, May Azar and Robin Kirby, both medical doctors, joined Tripoint as members, and in 2014 borrowed money from Plaintiff Avadis to buy an office building in Texas. This LLC entered into a written agreement with Plaintiff Avadis to borrow the funds. A Promissory Note guaranteeing monthly interest and maturity payback was signed by Dr. Garron L. Solomon and it was secured by the issuance of a Security Agreement signed by all three medical doctors, Defendants Solomon, Azar, and Kirby. On information and belief, these funds to

9

Tripoint were immediately transferred by Tony Azar, and Defendants, to Rockwall Commons and became part of the Enterprise that was used by Defendants to defraud Avadis, and the other Plaintiffs, of their business property and to further their racketeering activities. This loan was not repaid in part or in full by Tripoint.

37. Defendant May Azar is an individual, sister to Tony Azar, a medical doctor and a citizen of Massachusetts who, directly or indirectly, has participated and advanced the purposes of the Enterprise and its racketeering activities. She joined Tripoint, on information and belief, sometime prior to the issuance of the Promissory Note and Security Agreement, dated August 14, 2014, where she, Dr. Garron J. Solomon and Dr. Robin Kirby, became partners. The loan obtained by her was not repaid by her to Plaintiff Avadis.

38. Defendant Garron J. Solomon ("Dr. Garron J. Solomon") is an individual and a citizen of North Carolina who, directly or indirectly, has participated and advanced the purposes of the Enterprise and its racketeering activities. Together with May Azar and Robin Kirby, he never paid back the loan to Avaids.

39. Defendant Robin Kirby is an individual and a citizen of North Carolina, who, directly or indirectly, has participated and advanced the purposes of the Enterprise and its racketeering activities, and who also never repaid the loan to Avadis.

# IV.

## FACTUAL ALLEGATIONS
### [Common to all Claims]

40.     Defendant Tony Azar is the Chief Executive Officer of MACC. He is a businessman and the individual who is in control of all the limited liability companies that are the subject of this Complaint. He communicates with Plaintiff Avadis in the Arabic language.

41.     MACC Properties, LLC was founded in 2003, and in 2008 began to acquire multi-family real estate assets. It operates out of 245 West Main Avenue, Gastonia, North Carolina.

42.     In 2010 it formed Defendant Capstone, a management limited liability company, to manage its assets.

43.     In 2013, Defendant MACC was formed and in 2015 rebranded itself by creating a brokerage wing, "Century21 Capstone," and in 2017 expanded by creating "MACC Capstone Equity Fund."

44.     Defendant MACC is a private equity commercial real estate firm that seeks private capital to acquire and later to divest multi-family assets for a profit.

45.     On his MACC Website, Defendant Tony Azar describes himself as the individual who *"manages and oversees the complete process of identifying, analyzing, acquiring, managing, marketing and syndicating all properties belonging to MACC."*

46.     Sometime in his early youth in Aleppo, Syria, where he was born, Tony Azar met Naman Wakil, the recently indicted Miami, Florida, investor, who invested

and continued to invest to the present in numerous companies owned and/or managed by Tony Azar and Defendants.

47.     Naman Wakil, individually and through his LLCs, just like Plaintiffs, invested over $2,000,000.00 into Tony Azar's companies between 2012 and 2014, which are the subject of this Complaint.

48.     Naman Wakil was criminally indicted by the United States Attorney's Office for the Southern District of Florida, on July 29, 2021, and was arrested by the Department of Homeland Security agents on August 4, 2021, in Miami, Florida.

49.     Naman Wakil was charged, on July 29, 2021, with (a) conspiracy to violate the Foreign Corrupt Practices Act, 18 USC § 371; (b) violation of the Foreign Corrupt Practices Act, 15 USC § 78D; (c) International Laundering of Monetary Instruments, 18 USC § 1956-7477; and (d) engaging in transactions in criminally derived property. A true and accurate copy of Naman Wakil's Indictment.is attached hereto as **Exhibit A**.

50.     This Indictment charges Naman Wakil with obtaining a vast fortune that approximated $400 million, all criminally derived, starting sometime in 2010 and continuing to the present, obtained by bribing foreign government officials and non-government officials in Central and South America to illegally obtain government contracts and substantially profit illegally from them.

51.     To accomplish said endeavors, Naman Wakil used electronic communications (emails), telephone, mail, and in-person contacts, with said

government and non-government people, through bribes and money laundering, in this country and countries outside the United States.

52.    Naman Wakil then purchased numerous real estate assets in Florida and North Carolina, many the subjects of this Complaint.

53.    The Indictment also included forfeiture proceedings against the building owned by Wakil and Tony Azar where the principal offices of defendant Tony Azar are located at 257 Main Street, Gastonia, North Carolina.

54.    The U.S. Government also seized a bank account from United Bank, North Carolina, that was registered under both the names of Naman Wakil and Tony Azar.

55.    The financial ties between Naman Wakil and Tony Azar run deep, and have since at least 2010.

56.    Sometime in or around November 29, 2012, Naman Wakil purchased a $3.5 million business jet – a Cessna Citation X10 – and organized and created a company named "Citation X17 Ventures, LLC" in the Florida, with an address in Boca Raton, Florida.

57.    The Manager of this LLC was and has been Defendant Tony Azar, with an address at 1421 South Miami Avenue, Suite 8, Miami, Florida. This LLC has been and is still active and its last Florida Corporate Annual Report was filed on February 25, 2019.

58. On information and belief, this jet has been used by Tony Azar, Naman Wakil and others, on numerous trips to and from Florida, Mexico, Central and South America.

59. Defendant Tony Azar also created and organized a company named "Azar Aviation, LLC."

60. On information and belief, all contributions or investments by Naman Wakil into Tony Azar's and Defendants' limited liability companies, since at least 2012 to the present, were derived from specified criminal activities – money laundering – are predicate criminal acts considered for racketeering activities, and were further used to defraud Plaintiffs and to proximately cause injuries to their business interests and property.

61. The Executive Employees of Defendant Tony Azar's for company Investment, Asset Management and Financial Operations are his three daughters, Defendant Ashley Adams and Related Parties Maggie Munell and Chrissy Howard, respectively. Without their direct and/or indirect assistance the Enterprise would not have advanced.

62. Defendant John Azar is Tony Azar's brother and Executive Vice President of MACC. On the same website, he holds himself as the individual who *"directs strategic development and growth and oversees capital structure, alternative financing and investor and portfolio development."*

63. The Chief Financial Officer of MACC is Ron Bates, a Certified Public Accountant, who for the last eleven years has been MACC's and Capstone's CFO and

14

oversees all accounting, financial reporting, tax preparation and finances for all parent and sister companies and their assets. Without him, the Enterprise could not have advanced its racketeering activities.

64.     Plaintiff Avadis is an individual who originates from Venezuela and has been a businessman since his early age and involved with several companies that he and his family own in this country. Those businesses demanded that he travel to this country on business related trips. Being a citizen of Venezuela, he held what is called an *L-1 Non-Immigrant Visa* that has permitted him to legally do business in this country. He formed Plaintiff AATS. He is not an academically educated man as he did not finish the equivalent of high school in his country. Mostly, his business activities have included importing and exporting commodities to and from this country. He does not speak, write, or read English. As already noted, he communicates with Tony Azar via the Arabic language. He did not, and still does not, understand the complicated corporate system in this country and relies on local professionals.

65.     Plaintiff Avadis knew Naman Wakil, a resident of Florida and a citizen of Venezuela, who is described at length above and in the attached Indictment.

66.     Sometime during the summer of 2012, Wakil introduced Avadis to a business opportunity in the United States. Wakil referred him to Tony Azar, who as a long-established businessman in the United States, indicating that he could help Avadis invest in real estate.

67.    Wakil and Tony Azar instructed Avadis that he could use those investments to qualify and renew his Immigration L1 Business Visa to operate his businesses out of Miami. Mr. Wakil told Avadis that he had also used the same procedure with Tony Azar to help him with his INS Visa, and later his residence, through investing and to trust Tony Azar as an experienced businessman in real estate. Plaintiff Avadis began to communicate with Tony Azar via emails, telephone, mail and in person meetings.

### The Creation of 'Total Solutions Property Management" [TSPM]

68.    Sometime during the summer of 2012 there were telephone conversations and personal meetings between Tony Azar and Avadis about creating a company that would serve the purpose of assisting Avadis with his immigration business Visa and as an investment arm to accomplish it.

69.    As a result of those communications, Defendant Tony Azar recommended to him the creation of a limited liability company in North Carolina, because Tony Azar lived and had his companies here, for Tony Azar to manage Avadis' investments.

70.    Tony Azar then created Total Solutions Property Management, by filing Articles of Organization in North Carolina on October 9, 2012, with the assistance of his attorney. This company was to be a management company to receive contributions of capital from Avadis and the other Plaintiffs, for Tony Azar to invest them for Plaintiffs' benefit, and for managing all of Avadis' business affairs through this company.

16

71. Tony Azar then provided Avadis with a shareholder agreement, dated November 1, 2012, showing that TSPM, a Plaintiff herein, was a 100% owner of some corporation not identified by Tony Azar. No further explanations provided by Tony Azar to Avadis about this shareholder agreement.

72. In the Shareholder Agreement, Tony Azar included a provision (2.5) where he appointed himself as <u>both</u> directors of the LLC and its Sole Manager without the express knowledge and approval of Avadis. He included the name Avadis Avadis as President but did not request Avadis to sign the Operating Agreement. Tony Azar did not have Avadis sign the Operating Agreement until seven years later, when Tony Azar's immigration attorney asked Tony Azar to ask Avadis to sign it on March 1, 2019, as it was needed to process his Immigration Visa.

73. Tony Azar then sent an email to Avadis on October 29, 2012, inviting Avadis to invest and to participate in his Multi-Family-Asset buying business. In that email, Tony Azar stated, in pertinent part: *"you need to wire me $120,000.00, which will be used $105,000.00 for the cost of the bond, $10,500.00 as a 10% Premium to hold in Escrow <u>forever</u>, and $4,500.00 for attorney and CPAs for forming the LLC and all other necessary forms, taxes and licenses."* What he meant by those costs were then and still have remained a mystery to Avadis, due to Avadis' ignorance of the American partnership or corporate systems, thus no further inquiries were made by him.

74. As will be shown throughout this Complaint, that specific breakdown of investment and costs were to be the beginning of a pattern of falsities intended to deprive Avadis of his lawful investments.

75.     In 2019, Tony Azar provided Avadis with a spreadsheet to justify the costs of the above investments. This spreadsheet displayed an obtuse explanation of the initial investment, where Tony Azar informed Avadis that there was only a total investment left of $27,000.00 from the $120,000.00 contributed by him.

76.     The $120,000.00 requested was immediately contributed by Avadis to Defendant Tony Azar and Tony Azar responded that this contribution would be credited to plaintiff AA Total Solutions, as it was the 100% owner of TSPM. It is noted that after Tony Azar created TSPM and named himself its Sole Manager, he opened bank accounts, ran its investments, drafted operating agreements at will, kept its books and records, paid its taxes, and totally managed and controlled it, without ever providing any accountings to Avadis. Tony Azar refused to provide those company records to Avadis even after Avadis sued him and his companies in North Carolina Superior Court in 2020.

77.     Defendant Tony Azar has been involved in the creation and the management of limited liability companies since at least 2003 when he formed MACC Properties LLC. By 2012, Tony Azar considered himself an expert in the creation, operation, and management of these LLC companies, while Plaintiff Avadis was ignorant of these procedures and uses. Avadis thus remained totally dependent on Tony Azar's expertise, credibility in real estate business and his apparent good faith willingness to help Avadis.

78.     These companies are governed by their "operating agreements" that define the company members, economic members' rights, duties, equity participation,

managerial duties and responsibilities and contributions and distributions and other items specific to that company.

79.     The purpose for the creation of this new Management Company, TSPM, was to serve as management for the acquisition of multi-family properties, to assist Avadis with his immigration L1 Business Visa and to establish himself as a businessman in this country.

80.     As a result of the formation of this new company by Tony Azar, and the contribution of funds by Plaintiff Avadis, Defendant Tony Azar named himself as its Sole Manager and Registered Agent with total administrative powers over it. Neither before or after the creation of this company, did Tony Azar explain to Avadis his rights, duties and obligations as a member, even when both speak the same language.

81.     Defendant Tony Azar remained responsible as a sole manager to draft and execute its Operating Agreement/s and to prepare its books, records and tax matters. Up until 2020, when he, verbally through his lawyer, resigned as the Manager for TSPM, Tony Azar remained totally in control of this company. Tony Azar opened bank accounts for TSPM but refused to allow Avadis to review those bank records.

82.     After Avadis contributed $120,000.00 to TSPM, Tony Azar never provided Avadis with any timely yearly balance sheets, profit and loss statements, bank statements, payroll accounting or any records of the financial status of TSPM. And Tony Azar provided Avadis' Accountant, Alberto Ibarra, only with records to help him prepare yearly tax returns.

83.     Tony Azar, at some point after TSPM was created, informed Avadis that $105,000.00 had remained in TSPM's bank account and that it was used as an investment, but never told him into what investment or company the funds had been placed. That statement was contrary to the 2019 Final Spreadsheet of his investments and distributions that Tony Azar provided to Avadis as a compilation of Avadis' contributions to Tony Azar's Enterprise.

84.     At the present time, including the 2019 Spreadsheet provided by Tony Azar to Avadis, to explain this investment, Avadis still does not know what happened to his contribution previously described by Tony Azar as $105,000.00 for the cost of the bond, $10,500.00 as a 10% premium and $4,500.00, for attorney fees.

85.     A Spreadsheet provided to Avadis by Tony Azar in November 2019, for purpose of explaining his contributions to TSPM, showed $81,900.00 spent by Tony Azar, and his Enterprise, in numerous in-house furniture, professional fees, office supplies, payroll, insurance, licenses and an entry called, *'Return Capital from Bank Act'* for $45,902.72, without any clear explanation what this expenditure was for. The Spreadsheet showed only $27,911.33 in net investment amount and the same amount remaining as "capital return."

86.     At no point from the beginning of Tony Azar's email requesting Avadis the $120,000.00 to open the company through November 2019, did Tony Azar, or any Defendant, ever inform him how this contribution was used to his financial gain.

87.     Additionally, a review of relevant IRS records revealed that Tony Azar, and Defendants had used TSPM as a *Professional Employer Organization* (POE),

without Avadis' knowledge and consent, and had failed and continues to fail to pay payroll taxes, all to the injury of this plaintiff's business and property.

88.     The Financial Statements provided by Defendants, as a result of the North Carolina lawsuit for discovery in 2020-2021, showed TSPM capable of fulfilling its obligations, without liabilities, generating profits every year, except for a minimum loss observed in 2017. But despite TSPM generating earnings on its accounts, the final destination of the remaining funds for activities other than investments in real estate remained and continue to remain unknown to Plaintiffs.

89.     Lastly, review of independent records, has shown that TSPM managed over $10,000,000.00 in income during the period between 2012 and 2019.

## The Creation of "Wendover Investors, LLC"

90.     Wendover Walk was a 91-Unit residential property in Mecklenburg County, North Carolina.

91.     Pursuant to a telephone invitation by Tony Azar to Avadis to participate in the purchase of the above residential units, Avadis issued a check under AATS, payable to Capstone in the amount of $685,000.00 on January 30, 2013, based on Tony Azar's promise of a thirty three percent (33%) ownership of Wendover.

92.      Tony Azar closed the purchase of this multi-family asset on May 3, 2013.

93.     This was accomplished through a Limited Liability Company organized by Tony Azar that he named, Wendover Investors, a Defendant herein.

94.    Avadis found that this property was purchased for $5,910,000.00 and that the down payment was $1,394,000.00.

95.    It was not until May 23, 2013, via an email from Tony Azar to Avadis's Accountant, that Tony Azar informed him that he had used only $525,000.00 from the $685,000.00 previously provided to Capstone, to invest in Wendover Walk and had done so through AATS and TSPM.

96.    From the rest of the funds Tony Azar and/or Capstone used $75,000.00 to purchase a Convenience Store and Gas Station property, later disclosed as Fast Express, LLC, and used $35,000.00 to pay for Fast Express store inventory. No further explanations were provided.

97.    After all those expenditures, Tony Azar failed to tell Avadis what happened to the remaining $10,000.00 – from the $685,000.00 invested – and why these are still unaccounted for to Avadis.

98.    Years passed and on April 28, 2016, Tony Azar emailed Plaintiff AATS a copy of an Operating Agreement dated January – no day – 2013, signed electronically by Tony Azar on April 20, 2016, as WW Managers, LLC, ("WW Managers") a management company owned by Tony Azar, appointing himself and a certain unknown person, to Avadis, by the name of Robert Bryenton as Sole Managers for defendant Wendover.

99.    This Operating Agreement was not signed by Avadis either as an individual or as the owner of his companies. This Operating Agreement has an

Attachment as Schedule A that showed that Plaintiff AATS owned 34.61% of Wendover Investors.

100. On May 21, 2013, Tony Azar's lawyer, Brad June, sent an email to Avadis with an Attachment that included a "Subscription Agreement," according to a Private Offering Memorandum, signed by Tony Azar that showed an investment in "Village Square Investors, LLC" by Wendover Investors where Plaintiff AATS, through Avadis, ostensibly signed for $565,000.00 without indicating what percentage he would receive in exchange for said amount. Plaintiffs later learned, through the North Carolina Secretary of State website, that Village Square Investors, LLC is a North Carolina Limited Liability Company. The company is managed by its managers, and its only manager is Tony Azar.

101. Tony Azar's immigration lawyer, Brad June, also provided a copy of a Private Placement Memorandum ("PPM") dated March 21, 2013, to Avadis stating that Defendant Wendover was owned as follows, 6.43% by AATS – 6.43% by TSPM – 6.43% by Avadis – and 50% by WW Managers owned by Tony Azar, and other unknown, to Avadis, named investors.

102. Their total investment was $565,000.00.

103. Then in an email dated May 29, 2020, an attorney for Tony Azar, Thomas Foerster, provided Avadis with a copy of an Operating Agreement for Defendant Wendover that contained forged signatures of Avadis and his wife, Gaudy Sayegh Sakkal, which signatures in said Operating Agreement ostensibly approved a 50% ownership for Tony Azar, under WW Managers, his company, without a money

contribution, and a 31.23% to these Plaintiffs. Additionally, it included sixteen (16) additional – unknown to the Plaintiffs' – investors with an additional investment of $519,000.00. All total for an investment of $1,300,000.00.

104. There was also another Operating Agreement emailed to Plaintiff AATS, undated, which stated that WW Investors, owned by Tony Azar, was the 100% owner of Defendant Wendover.

105. The sale of Wendover Apartment Units took place on July 23, 2019, according to public records.

106. After August 1, 2019, when the Plaintiffs did not receive official notice of the sale of Wendover Walk Apartments by Tony Azar or Defendants, the Plaintiffs began to assemble a team of attorneys and accountants to review everything that was available to them through electronic means, mail correspondence, independent open-source research and all other means available. The attorneys for the Plaintiffs began to informally request documentary evidence from Tony Azar and his attorneys about Plaintiffs' investments. When no documentary evidence was voluntarily and significantly provided by Tony Azar to Plaintiffs, a state civil complaint for discovery was filed against Tony Azar and Defendants, in August 2020 in Gaston County Superior Court, North Carolina: 20-CVS-2557. This action was later voluntarily dismissed by Plaintiffs in June 2021, after no significant relevant records were provided to Plaintiffs. After nine months of fruitless litigation, including specific requests for records requested by Plaintiffs' forensic accountants, and when no answers were provided by Tony Azar and his attorneys sufficiently to assess the

24

investments of these Plaintiffs, the Plaintiffs' voluntarily dismissed their civil complaint.

107.    On August 20, 2019, Tony Azar sent an email to Avadis' CPA containing a Settlement Agreement with the buyers of Wendover Walk Apartments reporting its official sale at $8,200,000.00.

108.    As with other misrepresentations, Tony Azar's statement regarding the sale was made with the intent to deceive Plaintiffs.

109.    The statement did, in fact, deceive Plaintiffs until the Plaintiffs' search in public records showed the sale of Wendover Walk at $9,200,000.00.

110.    Independent research by Avadis found through "Harbor City Title Insurance," via an email dated January 28, 2020, that "you are correct, the settlement statement you sent to me - showing the amount of $8,200,000.00 - has clearly been altered and is incorrect."

111.    Additionally, Tony Azar's lawyer, Thomas Foerster, later sent an email to Avadis showing the correct amount to be $9,200,000.00, dated May 29, 2020.

112.    These serious discrepancies caused the Plaintiffs to demand detailed accounting from Tony Azar, Bates, his attorneys, and accountants on this investment.

113.    Tony Azar refused full voluntary production of records. As a result, Plaintiffs' accountants began to request internal records from the Internal Revenue Service.

114.    The Plaintiffs' accountant and personnel found that WW Investors, another company used by Tony Azar to conduct his business, was a company that was

dissolved on August 25, 2010. Upon information and belief, this company was used to simply support the investment as if coming from an existing company.

115. Despite reaching an original agreement with the Plaintiffs for equal parts of 33% for the Plaintiffs, 33% for Naman Wakil and 33% for Tony Azar since the acquisition of the Wendover Walk Apartment Units, the Tax Returns filed by Tony Azar showed a combined participation of the three Plaintiffs to continuously be 16.1406% in total. However, in the document generated by Tony Azar regarding the distribution of proceeds from the sale of the Wendover Walk Units, Tony Azar showed the Plaintiffs' participation to be 32.2813%. These discrepancies have significant tax implications for Plaintiffs.

116. Additionally, the Settlement Agreement provided by Tony Azar to Plaintiffs, as well as by his lawyer, showed a payoff to the bank of $4,706,566.96, which is higher than the one originally contracted for $4,600,000.00 in 2013. As Internal Revenue Transcripts showed $4,241,813.00 On December 31, 2018.

117. Pursuant to the tax returns as of December 31, 2018, mortgage liabilities are shown as $4,241,813.00, without any explanation for the $464,753.00 increase in debt and without any authorization and without disclosing its final use to Plaintiffs.

118. Defendant Wendover's last tax return was filed in November 2019 and the dissolution of the company was registered on March 31, 2020.

119. The Plaintiffs discovered that Tony Azar and all Defendants had intended to hide approximately $1,000,000.00 from the Plaintiffs by fraud. It was

26

through the efforts of Plaintiffs and their attorney this was discovered. In addition, the $1,000,000.00 the IRS depreciation recapture Section 1250 for the 2019 Return was considered a gain but not distributed to Avadis.

120.    Despite knowing of this illegal deficiency, Tony Azar and all Defendants, particularly their CFO, Bates, as he is responsible for all accounting and all companies' IRS returns, continue to knowingly fail to adjust this financial discrepancy with the IRS and to Plaintiffs.

### The Creation of Kingswood Financial

121.    On information and belief, this company never existed, and attempts at officially finding it have been made by Avadis' business office administrators to no avail. It was used by Tony Azar for the ostensible purpose of *"flipping houses,"* as the vernacular real estate term is used, meaning buying homes and selling them for a fast profit.

122.    After Tony Azar invited Avadis to participate with him in this real estate endeavor, Avadis submitted a check for $142,600.00 for the acquisition of properties in Detroit, Michigan.

123.    On May 22, 2013, Tony Azar sent an email to Avadis stating that the above amount was going to be credited to Plaintiff TSPM and that said amount would give it a one-third (1/3) equal partnership equity interest in Kingswood, with Naman Wakil and Tony Azar, as Naman Wakil was also a cash contributor to Tony Azar's many real estate business projects.

27

124. In an email dated May 22, 2013, Bates sent Tony Azar a Balance Sheet for Kingswood showing plaintiff AATS' participation in the $142,600.00 represented a 33% of ownership of Kingswood.

125. As Plaintiffs now know this was an outright lie because Kingswood does not exist and is not a legal entity.

126. Bates did not specify in said Balance Sheet what was the corporate or business structure of Kingswood, *i.e.*, a partnership, a corporation or an LLC.

127. These omissions were made with the intent to deceive Plaintiffs.

128. The investors were Plaintiff TSPM, Naman Wakil, and Defendant MACC, all with an equal 33% interest in Kingswood at $142,600.00 contribution by each person.

129. Additionally, Tony Azar sent another email, replying to Bates' on the same day, stating that he expected a closing of homes on June 15, 2013, for $530,000.00. He further stated that the sale would bring a gain of $33,000.00 to each partner in addition to their capital investments.

130. The Balance Sheet mentioned and provided by defendant Bates did not provide any information to Plaintiffs about the descriptions of homes being bought and "flipped."

131. Independent research by Plaintiffs' office personnel disclosed that there was no such Kingswood registered in the states of Georgia or of North Carolina or of Michigan. Furthermore, Defendants did not provide Plaintiffs with any Operating

Agreements, bylaws, or tax returns or any financial or accounting records on said entity. These acts did, in fact, deceive Plaintiffs.

132.    In an email dated October 16, 2019, in response to repeated requests by Plaintiffs to Tony Azar, for a full accounting of said investment, he responded only that there were no operating agreements. And Tony Azar and Defendants have failed to provide an accounting of said investment to Plaintiffs to the present time.

133.    In a Spreadsheet furnished to Avadis, by Tony Azar's lawyer, dated May 29, 2020, under the column for Kingswood, a comment was entered that stated, *"never was active."* Thus, it is clear that this company was used by Defendants to fraudulently obtain funds from Plaintiff Avadis, use them for their own gain and not Plaintiff's.

### The Creation of 'Meadows at Edgemont' – former 'Green Manor Investors LLC'

134.    On August 16, 2013, Tony Azar sent an email to Avadis and Naman Wakil inviting them to invest on a 110 Unit Rental Apartment Complex in North Carolina named Green Manor.

135.    The email explained the terms proposed by the bank that held the Units.

136.    Tony Azar, Avadis and Naman Wakil would be the investors.

137.    Tony Azar told both individuals that he would use the 24 homes that all three had already purchased, without further elaborating or providing records to show when they were bought, how they were bought and/or giving any details on how these 24 homes were acquired.

138.    The bank would exchange the 24 homes for the 110 Unit Complex.

29

139. The bank had an existing $2,400,000.00 mortgage that they would sell for $1,200,000.00.

140. The bank would buy the homes for $415,000.00 thus extinguishing the $415,000.00 balance owed to the bank for the loan taken to buy those homes by Tony Azar.

141. The three investors would contribute $270,000.00 each for equal percentages of ownership of Defendant Green Manor.

142. On September 11, 2013, Tony Azar sent Avadis and Wakil another email to have them sign documents and to further explain that each partner would need to contribute only $240,000.00 each and that Tony Azar would use $33,000.00 from another sale so that each partner would end up with $273,333.33 in contributions.

143. Tony Azar then told them that the percentages of participation would be as follows, the investing Bank with 30% - Tony Azar with 23.33% - Plaintiff AATS with 23.33% and Naman Wakil with 23.33%.

144. On September 15, 2013, Avadis sent a check for $240,000.00 to Tony Azar for his contribution to pay for this Green Manor project.

145. Tony Azar sent an email to Avadis on April 28, 2016, which included an email with an Operating Agreement dated September 10, 2013, signed electronically by all three and showing the following investors and their contribution-percentages, MACC Properties, LLC, owned by Tony Azar, with 51% - Wakil Properties with 24.5% - and TSPM with 24.5% ownerships. That Operating Agreement was never

authorized by Plaintiff Avadis or any Plaintiff to be signed electronically. By now the percentage of ownership by the bank had disappeared.

146. Tony Azar emailed another Operating Agreement dated September – no day - 2013, with only Tony Azar's signature, advising the partners that now "Green Manor Managers" - Tony Azar's other company - owned 50% and no other members were listed.

147. Thomas Foerster, Tony Azar's attorney, sent an email, dated May 29, 2020, to Avadis that included an Operating Agreement dated September 27, 2013, signed by Tony Azar, without including the nine investors in addition to Avadis and this Operating Agreement was ostensibly signed by Avadis, who denies signing it. Plaintiff Avadis's signature *is a forgery*.

148. Then, Douglas Arthur, Tony Azar's lawyer, emailed the same Operating Agreement but this time it included nine partners, and with the same *forged* signature.

149. By independent open source research by Avadis and his office personnel, it was found that Tony Azar and Bates had filed a Tax Return for 2013 stating that Plaintiff AATS's participation was only 6.85%.

150. At the present time, Plaintiff TSPM's participation appeared as 0.00%. It appeared from records obtained that Tony Azar refinanced it for $3,400,000.00 without notice or consent from Avadis, or Plaintiffs, as the sole owner of TSPM. That refinanced figure, if one applies principles of Appraisal, would mean an evaluation of the property for at least 20% with an approximate minimum value of $4,250,00.00,

31

reflecting at least an $850,000.00 gain in favor of Plaintiffs, if justly done, that was not credited by Defendants to the Plaintiffs' financial property injury.

151.    The mortgage documents were Notarized by Ashley Adams, Defendant herein.

152.    Additionally, Tony Azar authorized a distribution of $2,200,000.00 between unknown partners – excluding Plaintiffs – and thus diluting TSPM's ownership down to 0.00%, without Avadis' authorization.

## The Creation of Gaston Portfolio Office Building

153.    This was a purchase on June 3, 2014, of an office building located at 251 West Main, Gastonia, North Carolina, for $249,000.00.

154.    Tony Azar invited Avadis to participate in the purchase of this commercial property as a cash-purchase-only for $249,000.00 directly from the bank. Tony Azar told Avadis that there would be only two partners with a 50% equal ownership, *i.e.*, Tony Azar and Avadis. However, Tony Azar did not contribute any funds for this purchase.

155.    As a result of that invitation and agreement, Avadis contributed $107,000.00 on August 24, 2014 – then on September 12, 2014, contributed $110,000.00 – and an additional $74,900.00 that was contributed by Tony Azar on Avadis's behalf from funds that belonged to Avadis from the previous sale of another property, Fast Express, LLC.

156.    The total Contribution by Avadis was $291,000.00.

157.    The above invitation and promise of equal percentages between Tony Azar and Avadis was over the telephone. No other purchase-sale agreements or other records were ever provided to Avadis for this investment. Further independent open-source research disclosed an existing mortgage of $200,000.00 as of 2014.

158.    Later, upon requests from Avadis, Tony Azar, emailed him on April 28, 2016, an Operating Agreement dated February 6, 2015, digitally signed by the following parties, MACC, with a 21% ownership, Wakil Properties with 33% -- TSPM with 33% and Defendant Capstone with 13%.

159.    Recently in 2020, an attorney for Tony Azar provided Plaintiffs with an Operating Agreement dated May 28, 2014, signed electronically only by Tony Azar that reflected the participation of numerous – unknown to Plaintiffs' – investors and showing Plaintiff TSPM with a contribution of only $15,000.00 and a membership interest of 5.2265. And Tony Azar failed to disclose to Avadis the total investments by these investors and what ever happened to that capital.

160.    There was an "EXHIBIT A" attached to the above Operating Agreement showing Plaintiff TSPM with a capital contribution of only $4,500.00 with a percentage interest of 5.3191% as of September 12, 2014, with a Note stating, "*September 11, 2014 – 70% of capital returned,*" which is untrue.

161.    There is also a Closing Statement provided by Tony Azar to Avadis for the purchase of the commercial building that showed the Total Capital Investment by Plaintiff TSPM to be $249,000.00 instead of $292,000.00. This comes from a 2014

33

record issued by the United States Department of Housing and Urban Development (HUD).

162.    On its Gaston Portfolio Tax Returns for 2014, Form 1065, page 5, as well as its Tax Return History Report, Page 2, Avadis' cash contributions appeared as contributions in the amount of $291,000.00 but despite being a cash-transaction-only there appeared a long-term mortgage for $234,031.00 and a $197,000.00 in distributions to other investors that were never credited to either Avadis or any of the Plaintiffs herein.

163.    This property was sold on March 2, 2020, for $485,000.00, and through an independent research by Avadis and its personnel – as Tony Azar never provided the Plaintiffs with timely records since 2014 – showed a mortgage in the amount of $236,400.00 was paid off.

164.    Despite being a cash purchase, there was a long-term mortgage of $234,031.00 shown in the Tax Returns for December 31, 2019. There was also non-disclosure of these unknown investors to Avadis or the Plaintiffs and the fate of these funds.

165.    Defendant Capstone, mailed a check to plaintiff TSPM, in the amount of $4,618.00 with an attached Memo that stated, "*Final Distribution.*"

166.    Gaston Portfolio, was dissolved in April of 2020. The depreciation recapture under IRC Section 250 was never considered and made a part of the final distribution.

34

## The Creation of Fast Express Mart, LLC

167. Defendant Tony Azar invited Avadis to participate in the purchase of a gas station and convenience store in North Carolina via an email dated May 22, 2013, for a total investment of $110,000.00, which included $75,000.00 for the purchase of the MART and $35,000.00 to buy its existing inventory.

168. Tony Azar had used the contribution that Avadis had previously sent him in the amount of $685,000.00 dated January 30, 2013, to participate in Wendover Investors, for the purchase of Fast Express Mart, in the amount of $110,000.00.

169. The Financial Statement for Fast Express Mart, sent through the mail by Tony Azar through Avadis's attorney, along with a K1 IRS form (partner earnings) for 2013, showed a company with no commercial activity and only banking related expenses. There was no inventory shown in the Balance Sheet or sales of such inventory in the Income Statement.

170. There was also no Closing Statements or any documentation for the purchase or sale of this company provided to Avadis or to any Plaintiff at any time.

171. The Balance Sheet dated December 31, 2014, showed a 'member' withdrawal of $74,635.00.

172. Neither Avadis nor any Plaintiff ever received any distributions for either capital invested or gains from said $110,000.00.

## The Creation of Rockwall Commons Office Building

173. On August 19, 2014, Tony Azar sent an email to Avadis and Naman Wakil about an investment opportunity which referred to the purchase of an office

35

building in Texas that Tony Azar's sister, Defendant May Azar – a medical doctor – wanted to purchase with other medical doctors and use it in part for a new medical clinic. "Tripoint Diagnostics, PLLC," a North Carolina PLLC, whose Manager, Garron J. Solomon, M.D., owned it, and would join them. The Texas building was valued at $4,200,000.00 and needed a loan of $2,900,000.00.

174.   Tony Azar requested loans from Avadis and Naman Wakil for $230,000.00 each, which both provided to Tony Azar, evidenced by an email from Tony Azar dated August 22, 2014.

175.   This loan by Avadis was secured by a Promissory Note dated August 14, 2014, signed by Dr. Garron Solomon, on behalf of "Tripoint Diagnostic, PLLC," and Medical Doctors, May Azar and Robin Kirby, which guaranteed Plaintiff TSPM the payment of its investment in the amount of $200,000.00 by its maturity on August 31, 2015.

176.   The rate of interest was originally promised to be 10% by Tony Azar, however, this was later shown to be 8% per annum on the Note and further guaranteed by consecutive monthly installments of interest starting on October 1, 2014. The interest on the Note was to generate an additional $23,000.00 for the investors once payoff is made, in addition to monthly interest payments.

177.   Additionally, the Promissory Note was secured by a Security Agreement encumbering the building project, a Guaranty Agreement from Drs. Garron Solomon, May Azar and Robin Kirby, and other UCC Financing Statements and other Security Instruments.

36

178. It is noted that even though Avadis invested $230,000.00, the Promissory Note was made for only $200,000.00 and the interest was independently downgraded by Tony Azar to 8% from the promised 10%. Neither Avadis nor the other Plaintiffs were previously consulted on these changes.

179. On June 11, 2014, Defendant Rockwall Commons was formed in Texas by Defendant Rockwall Founder.

180. Defendant Rockwall Founder, was formed on the same June 11, 2014, and has no managers and was to be governed by its governing members, Ibanez LP and Bowman Investment Group, LLC.

181. On information and belief, the Ibanez LP was dissolved in 2016.

182. Neither Avadis individually, nor Plaintiff TSPM, directly or indirectly, and/or any Plaintiff, ever received any consecutive monthly payments of interest or the return of the capital either before or by its maturity date of August 31, 2015.There was never a full payoff of the Note by "Tripoint Diagnostic, PLLC," and/or the three medical doctors.

183. On information and belief, what is known is that Tony Azar transferred the funds of $230,000.00 into Rockwall Commons.

184. On information and belief, the production of the signed Promissory Note, with its secured instruments by the medical doctors was nothing more than a pre-planned ruse by Tony Azar, and the three doctors, to unlawfully appropriate the Plaintiffs' funds for their own use and with the apparent acquiescence of Rockwall Founder.

185. Defendants Tony Azar, May Azar, Garron Solomon, Robin Kirby, Rockwall Commons, and Rockwall Founders, along with other Defendants named herein, acted together and operated as a common unit to defraud Plaintiffs.

186. Tony Azar emailed Avadis an Operating Agreement on December 11, 2014, signed only by Tony Azar, showing an additional fifteen investors of which Plaintiff TSPM, was one of them with a Capital Contribution of $200,000.00 and a 13.08% membership interest in his company.

187. Tony Azar provided to Avadis's attorney, Robert Deutsche, K1 Forms for the years 2016-2019, as required by the IRS to show partner's share of profits, disclosing that Avadis' interest in the company was 7.58%. The production of these required Partner's K1 forms were not timely provided to Avadis, or to any Plaintiff, and required the professional intervention of Plaintiffs' lawyers to obtain them.

188. Avadis received the amount of $20,000.00 and TSPM received the amount of $48,000.00 that were deposited in a BB&T bank account without his knowledge, for this financial affair.

### The Creation of Falcon Pointe Investors, LLC

189. Upon invitation of Tony Azar through telephone calls and a meeting in Miami, Florida – at 1421 South Miami Avenue, Suite 8 – to Avadis to participate in the acquisition of a Rental Apartment Complex in North Carolina, Avadis mailed a check to Tony Azar on March 13, 2014, in the amount of $285,000.00 to contribute to this company Falcon Pointe Investors.

38

190. This is supported by an Operating Agreement emailed and dated on April 28, 2016, showing Avadis' ownership interest of 30%.

191. Tony Azar had emailed a copy of an Operating Agreement to Avadis on March 3, 2014, signed electronically by Tony Azar, Avadis and Naman Wakil, attesting to their individual contributions and percentages.

192. Tax Returns from 2014 showed a mortgage of $3,300,000.00 in short and long-term portions combined.

193. Tony Azar sent an email dated April 28, 2016, to Avadis indicating that capital contributions by Tony Azar were $300,000.00 with a 40% ownership – Naman Wakil with $285,000.00 for a 30% ownership and Avadis with $285,000.00 for a 30% ownership.

194. However, on the Tax Return for 2014, Tony Azar reported an 11.81% ownership for the three Plaintiffs.

195. There was an email to Avadis' attorney Robert Deutsch, sent by Tony Azar's counsel, Douglas Arthur, in 2021, in court discovery, that has an Operating Agreement (O/A), dated March 3, 2014, with an Exhibit A attached, disclosing eighteen (18) members, one of which is 'Falcon Pointe Managers, LLC,' which was another company owned by Tony Azar to manage Falcon Pointe Investors, with the exception that 'Falcon Pointe Managers, LLC,' is now a 50% owner of defendant Falcon Pointe Investors.

39

196.     Tony Azar did a distribution of $915,000.00 between unknown partners, excluding Plaintiffs, and diluted Avadis' ownership down to 0.00% without either notification, authorization and/or consent of Avadis or Plaintiffs.

197.     Tony Azar refinanced this property for $9,100,000.00 without notice and consent of Avadis and by failing to provide any company records or the fate of those funds. On information and belief, an appraisal on $9,100,000.00 means a property evaluation of at least 20% resulting in an appraised value of approximately $11,375,000.00, and thus failing to reflect at least $2,275,000.00 in favor of Plaintiff Avadis' participation.

### The Creation of Southern Pines Apartments, LLC

198.     This is a South Carolina real estate asset named Southern Pines Apartments where Avadis's contribution came from a balance owed to him from other investments in the amount of $350,000.00.

199.     Tony Azar emailed Avadis on October 16, 2019, an Operating Agreement which was dated on March 6, 2012, without signature and without including named partners in an attached Schedule A.

200.     Tony Azar additionally emailed Avadis another operating agreement, undated, with missing pages and incomplete. The Schedule A showed eleven partners and TSPM was not included.

201.     This Operating Agreement showed Tony Azar and MACC with a capital contribution of $350,000.00 and 10.29% of Class A Interests and 5.35%.

40

202. Tony Azar emailed Avadis' CPA Ibarra, on October 11, 2019, stating that Tony Azar only considered Avadis as an investor and not as a partner.

203. Another email dated October 16, 2019, informed Avadis' CPA Ibarra that TSPM and MACC invested in this project in 2014-2015 but did not provide any evidence of this investment to Avadis. It was not until 2019 that Avadis found out about this investments or loan.

204. Pursuant to the Spreadsheet provided by Tony Azar, and Defendants, in November 2019, there is a loan by Avadis in the amount of $300,000.00 shown, instead of $350,000.00.

205. Pursuant to the Spreadsheet of November 2019, there appeared a capital return in the amount of $248,000.00 to Avadis from a loan for said amount.

206. However, Tony Azar, and Defendants, never provided Avadis, or the other Plaintiffs, with copies of the loan agreement, ostensibly entered by Plaintiffs and Defendants. There was never any evidence provided where the loan originated and where it ended.

207. Defendants' fraudulent offers to Plaintiffs to invest, their subsequent concealments, manipulations, dilutions and disappearances of legitimate investments by the Plaintiffs, were carried out by initial invitations by telephone, in-person meetings and by numerous e-mails with promises of precise and set percentage ownerships and gains for Plaintiffs, only to be changed – sometimes immediately and sometimes during the course of the Enterprise – by manipulating

41

the LLC's operating agreements, by emails, by forgeries, by introducing laundered funds, all to the injury of Plaintiffs' businesses and their properties.

208. Defendant Tony Azar, as the Kingpin of this racketeering enterprise, has engaged from at least 2012, and continues to engage to the present, in a pattern of racketeering activity, with the direct and/or indirect assistance of each and all Defendants. By using limited liability companies, Tony Azar and Defendants created the Enterprise, and acted for the common purpose of advancing the racketeering activities, which proximately caused the injury to Plaintiffs' businesses and properties and affected interstate and foreign commerce.

## V.

## FIRST CLAIM FOR RELIEF
### [Federal Civil RICO - 18 U.S.C. § 1962(c)]

209. Plaintiffs incorporate by reference all the preceding paragraphs of this Complaint as if fully set forth herein.

210. Each Plaintiff is a "person" capable of holding legal or beneficial interest in property within the meaning of 18 U.S.C. § 1961(3).

211. Defendants violated RICO and Plaintiffs were proximately injured as a result.

212. Each Defendant is a "person" capable of holding legal or beneficial interest in property within the meaning of 18 U.S.C. § 1961(3).

213. Each Defendant violated 18 U.S.C. § 1962(c) by the acts described in the above factual allegation paragraphs and as further described below.

42

214. To prove a violation of 18 U.S.C. § 1962(c) the following elements must be shown that, (1) an Enterprise existed, (2) the Enterprise affected interstate or foreign commerce, (3) the Defendants were associated with or employed by the Enterprise, (4) the Defendants engaged in a pattern of racketeering activities, and (5) the defendants conducted or participated in the conduct of the enterprise through the pattern of racketeering activity.

### *The Enterprise*

215. An Enterprise includes any individual, partnership, association or other legal entity under 18 U.S.C. § 1961(4), *i.e.*, an association-in-fact that must possess three qualities, a purpose, relationships among those associated with the enterprise and longevity sufficient to permit these associates to pursue the Enterprise's purpose.

216. The members of the Enterprise function as a continuing unit with the ascertainable structure separate and distinct from that of the conduct of the pattern of racketeering activity. There may also be other members of this Enterprise who are unknown at this time.

217. The Plaintiffs have alleged in this Complaint that the Enterprise consisted of a group of seven individuals and sixteen limited liability companies, one professional liability company and one non-existent business entity, operating in various states.

218. This group of individuals and business entities constituted the Enterprise.

43

219.    This group was characterized by a common purpose, it was and is an on-going formal group of persons and company personnel who functioned, and is functioning as a continuing unit, which constitute the Enterprise. At all relevant times the Enterprise acted together for a common purpose and to achieve a common course of conduct, *i.e.,* defrauding the Plaintiffs.

220.    The Enterprise is comprised of all individual Defendants and the limited liability companies created by Tony Azar, including Defendant MACC with its CEO, CFO, Vice President, Executive Managing Directors of Investment, Asset Management and Financial Operations, and all employees who directly or indirectly contribute to their operations and management, and 'but for' the conduct constituting the violations the Plaintiffs would not have been injured.

221.    This Enterprise itself and/or the racketeering activities of those associated with the Enterprise have affected interstate and foreign commerce as these racketeering activities have crossed interstate lines between North Carolina, South Carolina, Florida, and Texas.

222.    The sheer longevity of the Enterprise, from 2012 to the present, irrespective of whether Defendants also may have engaged in lawful activities – on information and belief – the Defendants knew of the existence of the Enterprise and of the general nature and purpose of its activities.

### *The Pattern of Racketeering Activity*

223.    Defendants engaged in a pattern of racketeering activities.

224. A person engages in a pattern of racketeering activity if that person commits at least two (2) racketeering acts, sufficiently related to constitute a pattern, within ten years of each other, pursuant to 18 U.S.C. § 1961(5). To establish "a pattern of racketeering activity" the predicate acts – the crimes – must be both <u>related</u> and <u>continuous</u>.

225. Related conduct embraces criminal acts that have the same or similar purposes, results, participants, victims, or methods of commission and are interrelated by distinguishing characteristics and are not isolated events.

226. This is an open-ended continuity of racketeering acts as these acts have continued and on-going for several years and, if not stopped, are projected into the future with a threat of repetition.

227. "Racketeering activity" consists of no more and no less than commissions of criminal acts, *i.e.*, here, wire frauds which contained misrepresentations of fact on promised one-third percentage ownerships of real estate assets by Plaintiffs, which Plaintiffs detrimentally relied on to their business injury, which was proximately caused by Tony Azar and Defendants' unlawful actions.

228. Plaintiffs have alleged in this Complaint that Defendants have committed, not only two acts, but numerous racketeering-related acts, within ten years, using the mail to submit intentionally false data, as shown above and below, and used *interstate "wires"* – emails and telephones – in connection with the alleged fraud. On information and belief, Defendants engaged in money laundering, mail and

wire fraud, forgeries and have submitted false documents to the Internal Revenue Service.

229.    To prove a pattern of racketeering activity, it is not sufficient for the Plaintiffs to prove only that the defendants committed two of the racketeering acts. A series of disconnected acts does not constitute a pattern.

230.    Plaintiffs, on the contrary, have shown by the alleged factual allegations in this Complaint, that numerous acts of racketeering were committed and that these were connected by a common scheme, plan, or motive, to defraud Plaintiffs of their business properties.

231.    The Plaintiffs have alleged that there was a meaningful connection between the Defendants' illegal acts and the affairs of the Enterprise. That Defendants' positions in the Enterprise facilitated the commission of the racketeering acts, promoted and advanced the goals of the Enterprise.

232.    As the factual allegations made clear, for each creation of a limited liability company there were initial telephone, personal meetings and/or email invitations, with very clear and defined promises of percentage ownerships – always for a one-third ownership percentages between Tony Azar and the Plaintiffs, including Naman Wakil – for real estate asset investments. These were much later followed by a series of emails containing different operating agreements unilaterally changing the agreed-upon original terms of ownership with lower percentages for the Plaintiffs but increasing the percentages of ownerships for Tony Azar and his Enterprise. The infusion of monies by Plaintiffs into Defendant companies created

46

more companies, or subcompanies, that continued to advance the Enterprise and to make it each time more profitable to said Enterprise.

233.   Additionally, many times the initial investments by Plaintiffs were decreased by contribution-dilution through Plaintiffs-unapproved injection of new investors into those companies and/or by splits and transfers of those investments to newly created LLCs owned, managed, and operated completely by Tony Azar, *i.e.*, by the Enterprise. This Enterprise could not move forward without the aid of its parts and components, which were its employees who operated financial logistics, tax matters, asset buying, accounting, management, banking and a myriad of company tasks.

234.   At other times, Tony Azar did not even transfer the Plaintiffs' full investments into their promised companies but diluted those full investments by splitting them into different companies proximately causing those contributions to decrease in value and/or to fully disappear. Additionally, many times Tony Azar, and Defendants directly or indirectly, used the Plaintiffs' capital investments to be transferred unilaterally, and without Plaintiffs' knowledge and/or approval, to other endeavors suited only to benefit Tony Azar, the Defendants, and the Enterprise, proximately causing injury to Plaintiffs' business and property.

235.   Plaintiffs detrimentally relied on the original representations made to them by Tony Azar to their business injury.

236.   Defendants, each of whom are persons associated with, or employed by, the Enterprise, did knowingly, willfully and unlawfully conduct or participate,

directly or indirectly, in the affairs of the Enterprise through a pattern of racketeering activity within the meaning of 18 U.S.C. §§ 1961(1)(B)(1), 1961(5) and 1962(c). The racketeering activity was made possible by Defendants' continuous use of emails, telephone, personal meetings with Avadis, mail, forgeries, money laundering and submission of false documents to the IRS, to promote and advance the Enterprise. Defendants had the specific intent to engage in the substantive RICO violations alleged herein.

237. Predicate acts of racketeering activity are criminal acts which are indictable under provisions of the United States Code, enumerated in 18 U.S.C. § 1961(1)(B), as more specifically alleged below. Defendants not only committed two such acts, but numerous predicate acts within 10 years, and/or else aided and abetted such acts, and these acts were *related* to each other and were of a *continuing* nature, as it was shown above, by the use of Tony Azar's repeated initial promises for fixed ownership percentages for Plaintiffs only to be changed by Tony Azar through the use of Operating Agreements changing those fixed promises of promised ownership percentages.

238. The acts of racketeering were not isolated but rather had the same or similar purpose and results, participants, victims and methods of commission, as above shown. Furthermore, the acts of racketeering by Defendants have been continuous. There were repeated acts beginning in the year 2012 and continuing to the present and there is a continued threat of repetition of such conduct, if not stopped.

48

239. Plaintiffs specifically allege that Defendants participated in the operation and management of the Enterprise by overseeing and coordinating the commission of multiple acts of racketeering as described below.

### *Predicate Acts: Use of Mail and Wires to defraud Plaintiffs, in violation of 18 U.S.C. §§ 1341 and 1343.*

240. Here, the predicate acts are *Mail Fraud*, which is (i) an intentional participation in a scheme to defraud a person of money or property and (ii) the use of the mails in furtherance of the scheme. The gravamen of the offense is the scheme to defraud, and any mailing incident to an essential part of the scheme satisfies the mailing element, even if the mailing contains no false information if it is in furtherance of the scheme to defraud.

241. Plaintiffs have also alleged numerous acts of *Wire Fraud,* 18 U.S.C. § 1343, which makes it unlawful and a crime, *whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises transmits or causes to be transmitted by means of wire … communication in interstate or foreign commerce, any writings, signs, signals, pictures or sounds for the purpose of executing such scheme or artifice.*

242. Defendants, and each of them, directly or indirectly, committed acts constituting indictable offenses under the above code sections in that they devised or intended to devise a scheme or artifice to defraud Plaintiffs or to obtain money from Plaintiffs by means of false or fraudulent pretenses, representations or promises. For the purpose of executing their scheme or artifice, Defendants caused delivery of

49

numerous false documents to Plaintiffs by wire communications in interstate or foreign commerce. The acts of Defendants set forth above were done intentionally and knowingly and with the specific intent to advance Defendants' common scheme, plan or motive.

243. Defendants conducted their scheme as alleged in the Factual Allegations above by using interstate wire communications, telephone, wire and mail, in furtherance of their plan to defraud Plaintiffs of their money, to their business injury.

244. As a result of said scheme, Defendants caused Plaintiffs to wire or mail over $2,000,000.00 in cash to defendants between the years of 2012, 2013 and 2014.

245. Defendants' shared objective and common scheme was and continue to be to the present, to extract monies from Plaintiffs and to divert those funds to the Defendant's own use and benefit., *i.e.*, to their Enterprise by means of these racketeering acts.

246. Plaintiffs reasonably and justifiably relied upon Defendants' representations, false pretenses and deceptive communications and Plaintiffs have been damaged as a direct and proximate cause by Defendants' pattern of racketeering activities, in their efforts to defraud Plaintiffs' over $2,000,000.00 of their business property.

247. Thus, the Plaintiffs sustained an injury to their business or property. These damages were either proximately caused by the predicate acts or indirectly caused by the pattern of acts, or both.

50

### *Predicate Act: Money Laundering under 18 U.S.C. § 1957, relating to engaging in monetary transactions in property derived from specified unlawful activity, pursuant to 18 U. S. C. § 1961(B).*

248.   Here, the predicate act is *Money Laundering* under the provisions of 18 U.S.C. § 1957, that makes it a crime for any person to knowingly engage in a monetary transaction in criminally derived property of value over $10,000.00, where it is not necessary to prove that the person knew that it came from a specified unlawful activity but that it affected interstate or foreign commerce.

249.   In this Complaint, on information and belief, the funds received by the Enterprise from Naman Wakil, well over $2,000,000.00 in cash, came from specified unlawful activities.

250.   The reference to 'monetary transaction' means the deposit, transfer or exchange of funds or a monetary instrument, under 18 U.S.C. § 1961 (d)(f)(1).

251.   The term 'criminally derived property' means any property constituting, or derived from, proceeds obtained from a criminal offense under 18 U.S.C. § 1957(d)(f)(2).

252.   The term 'specified unlawful activity' means money laundering as a racketeering act under 18 U.S.C. § 1961(1)(B).

253.   Here, we have an investor by the name of Naman Wakil who, between 2012 through 2014 – on information and belief possibly before and after these years – intentionally and unlawfully invested into the Enterprise, controlled by Tony Azar, and Defendants, with well over $2,000,000.00 in various cash transfers derived from proceeds obtained from the commission of criminal offenses – money laundering –

51

based on the recently filed criminal Indictment charging him with international money laundering from as early as 2010.

254.    As it is reflected in the Indictment of Naman Wakil, Wakil unlawfully obtained over $400 million dollars through the bribing of foreign government officials from 2010 to the present and unlawfully laundered those funds through United States banking institutions and/or international banks and through defendants' Enterprise. Exhibit A. This was done with the intention of legitimizing those funds through the Enterprise. *See* Exhibit A.

255.    That same Indictment outlined the history of Naman Wakil's bribery of corrupt foreign government officials, money laundering activities, the purchase of real estate assets in Florida and the placing of a forfeiture lien – Lis Pendens –  by the U.S. Government on one building in Gastonia, North Carolina, where Tony Azar's companies are presently housed, and that are owned by both Tony Azar and Naman Wakil, which points to a close business relationship between them. *See* Exhibit A.

256.    The U. S. Government also seized a United Bank Account in North Carolina, where both, Tony Azar and Naman Wakil, were the apparent account holders.

257.    The factual allegations in this Complaint, include numerous email correspondence between Wakil and Tony Azar inviting Wakil to invest in his Enterprise. Wakil's vast illegal fortune and use of that fortune to acquire real estate assets in this country, all offered by Tony Azar to him, create a strong financial bond between these two persons.

52

258. The infusion of at least $2,000,000.00 in laundered funds into Tony Azar's Enterprise, by Naman Wakil, are predicate acts of racketeering activities.

259. As alleged below in § 1962(a) and (b) Claim for Relief, Tony Azar and Defendants invited Wakil to invest into the Enterprise and acquire interests in the Enterprise – on information and belief – knowing that any and all funds originating from Wakil, and/or Wakil's companies, were the product of criminally derived property.

260. From 2012 to the present, Tony Azar, and Defendants, knowingly and intentionally requested criminally derived funds from Wakil to contribute and/or invest, or be loaned, to the Defendants' multiple real estate companies.

261. Upon information and belief, Defendants consequently have conducted and/or participated, directly and/or indirectly, in the conduct of the affairs of the alleged Enterprise through a pattern of racketeering activity as defined herein in violation of 18 U.S.C. § 1962(c).

262. The unlawful actions of Defendants, and each of them, have directly, illegally, and proximately caused and continue to cause injuries to Plaintiffs in their business and property. Plaintiffs seek an award of damages in compensation for, among other things, the millions of dollars Defendants stole from Plaintiffs.

263. Plaintiffs accordingly seek an award of three (3) times the damages it sustained, and the recovery of reasonable attorneys' fees and costs of investigation and litigation, as well as any other relief as authorized by statute.

# VI.

## SECOND CLAIM FOR RELIEF
### [Violation of 18 U.S.C. § 1962(a)]
### [Unlawful Investing in the Enterprise]

264.    Plaintiffs incorporate by reference all the preceding paragraphs of this Complaint as if fully set forth herein.

265.    It is unlawful under § 1962(a) for any person who has received any income derived, directly or indirectly, from a pattern of racketeering activity, ***to use or invest***, directly or indirectly, any part of such income, in the acquisition of any interest in, or the establishment or operation of, any enterprise which is engaged in, or in the activities of which, affect, interstate or foreign commerce.

266.    The elements necessary to prove the above violation are, (a) the existence of the Enterprise, (b) that it affected interstate or foreign commerce, (c) that defendants used and (3) invested income that was derived from a pattern of racketeering activity into the Enterprise.

267.    First, plaintiffs have alleged sufficient facts in this Complaint, some on information and belief, to prove that Defendants created, managed and operated an Enterprise.

268.    That it affected interstate or foreign commerce as these crossed interstate lines.

269.    The gravamen of this violation is to prevent "dirty money" from being invested into legitimate businesses. "Dirty Money" referring to unlawfully and criminally derived money.

54

270. Defendants, and each of them, requested and allowed Wakil's "dirty money" to be invested into their Enterprise. In doing so, Defendants violated § 1962(a).

271. Defendants, and each of them, directly or indirectly, aided and/or abetted, the invitation to Naman Wakil to contribute, to use and/or to <u>invest</u> his illegally derived funds, to advance and to further promote the Enterprise, via laundered monies and in violation of 18 U.S.C. § 1957, the money laundering statute.

272. These continuous contributions by Naman Wakil of monies derived from criminal activities to invest into the Enterprise for several years constituted a pattern of racketeering activity pursuant to 18 U.S.C. § 1961(5). The motive of Wakil for such investments was clearly to legitimize his illicit funds while profiting from them and by Defendants intentionally and knowingly allowing those illicit funds to be invested into their Enterprise and by also profiting from them.

273. Furthermore, as a direct and proximate cause of Defendants' racketeering activities and violations of 18 U.S.C. § 1962(a), Plaintiffs have been injured in their business and property in that through the receipts of those illegally laundered funds, Tony Azar, and each and all Defendants, caused lawfully invested funds by Plaintiffs to be unlawfully tainted, which Defendants then used, invested and commingled them to the Plaintiffs' business injury.

274. Defendants have conducted and/or participated, directly and/or indirectly, in the conduct of the affairs of the alleged Enterprise through a pattern of racketeering activity as defined herein in violation of 18 U.S.C. § 1962(a).

275.    The unlawful actions of Defendants, and each of them, have directly, illegally, and proximately caused and continue to cause injuries to Plaintiffs' businesses. Plaintiffs seek an award of damages in compensation for, among other things, the millions of dollars Defendants stole from Plaintiffs.

276.    Plaintiffs accordingly seek an award of three (3) times the damages they sustained, and the recovery of reasonable attorneys' fees and costs of investigation and litigation, as well as any other relief as authorized by statute.

## VII.

### THIRD CLAIM FOR RELIEF
### [Violation of 18 U.S.C. § 1962(b)]
### [By Acquiring Interest in Enterprise]

277.    Plaintiffs incorporate by reference all the preceding paragraphs of this Complaint as if fully se for herein.

278.    It is unlawful for any person, under Section 1962(b), ***to acquire or maintain***, directly or indirectly, any interest in or control of any enterprise which is engaged in, or the activities of which, affect interstate or foreign commerce.

279.    Defendants acquired and maintained interests in and control of the Enterprise through a pattern of racketeering activity. Specifically, Defendants, and each of them, requested, obtained and used the funds provided by Naman Wakil, from 2012 through 2014, that came from criminally derived property – money laundering – to acquire interests in real estate assets and thus maintain the Enterprise in operation and to further its scheme to defraud Plaintiffs of their lawful investments.

280.    These affected interstate and foreign commerce.

56

281. The gravamen of this violation is to use criminally derived monies or properties to acquire interests in legitimate real estate assets, and if so, the violation has been proven. Here, Defendants and each of them, whether directly or indirectly, whether by aiding or abetting, requested and received illegally derived funds from Wakil, knowingly and intentionally, and allowed Wakil to acquire interests in real estate assets owned by defendants and their Enterprise.

282. The racketeering above constitutes a pattern of racketeering activity pursuant to 18 U.S.C. § 1961(5).

283. As direct and proximate cause of the Defendants' racketeering activities and violations 18 U.S.C. § 1962(b), Plaintiffs have been injured in their business and property, specifically, by Defendants requesting and receiving those illicit funds from Naman Wakil and using those funds to acquire parts of the Defendant Companies, where Plaintiffs had invested into. Defendants were motivated by profit from illegally derived funds.

284. Upon information and belief, Defendants have conducted and/or participated, directly and/or indirectly, knowingly and intentionally, in the conduct of the affairs of the alleged Enterprise through a pattern of racketeering activity as defined herein in violation of 18 U.S.C. § 1962(b).

285. Defendants' acquisition and control over the Enterprise cause Plaintiffs injury.

286. The unlawful actions of Defendants, and each of them, have directly, illegally, proximately, and independently of the other predicate acts described here

caused and continue to cause injuries to Plaintiffs' businesses and properties. Plaintiffs seek an award of damages in compensation for, among other things, the millions of dollars defendants stole from Plaintiffs.

287.    Plaintiffs, accordingly, seek an award of three times the damages they sustained, and the recovery of reasonable attorneys' fees and costs of investigation and litigation, as well as any other relief as authorized by statute.

## VIII.

## FOURTH CLAIM FOR RELIEF
### [Conspiracy to Violate Federal Civil RICO – 18 U.S.C. 1962(d)]

288.    Plaintiffs incorporate by reference all the preceding paragraphs of this Complaint as if fully set forth herein.

289.    In violation of 18 U.S.C. § 1962(d), the Defendants, and each of them, knowingly, willfully, and unlawfully conspired to conduct, participate, and facilitate a scheme which included the creation, operation and or management of a RICO Enterprise through a pattern of racketeering activity as above alleged in the factual allegations common to all claims.

290.    This conspiracy commenced as early as 2012 and is ongoing.

291.    The conspiracy's purpose was to divert lawful funds from the Plaintiffs to Defendants for their own benefit through fraud.

292.    As previously alleged, the Enterprise was engaged in, or its activities affected interstate commerce.

293.    The Defendants, and each of them, have intentionally conspired and agreed to, directly or indirectly, use and/or invest criminally derived income, and

58

income derived from a pattern of racketeering activity, as alleged in this Complaint, to advance and promote their Enterprise and its scheme to defraud Plaintiffs of their business property. These Defendants knew that their predicate acts of mail and wire fraud and money laundering were part of a pattern of racketeering activity and agreed to the commission of those acts to further the schemes described above. This conduct constitutes a conspiracy to violate 18 U.S.C. § 1962(a), (b) and (c) in violation of 18 U.S.C. § 1962(d).

294. Put simply, the Defendants, and each of them, agreed that another coconspirator would commit two or more acts of racketeering in violation of 18 U.S.C. § 1962.

295. Even if some of the Defendants did not agree to harm Plaintiffs specifically, the purpose of the acts they engaged in was to advance the overall object of the conspiracy, and the harm to Plaintiffs was a reasonably foreseeable consequence of Defendants' actions.

296. As a direct and proximate cause of the Defendants' conspiracy, the overt acts undertaken in furtherance of that conspiracy, and violations of 18 U.S.C. § 1962(d), Plaintiffs have been injured – and continue to be injured – in their business and property, specifically, the taking of over $2,000,000.00 in cash of Plaintiffs' lawful investments, and its expected gains and profits, by diluting, splitting, transferring, decreasing, disappearing, and simply stealing those funds from Plaintiffs.

297. Defendants have conducted and/or participated, directly and/or indirectly, in this conspiracy through its Enterprise and through a pattern of racketeering activities as defined herein and in violation of 18 U.S.C. § 1962(d).

298. The unlawful actions of Defendants, and each of them, have directly, illegally, and proximately caused and continue to cause injuries to Plaintiffs' businesses and property. Plaintiffs seek an award of damages in compensation for, among other things, the millions of dollars defendants stole from Plaintiffs.

299. Plaintiffs, accordingly, seek an award of three times the damages they sustained, and the recovery of reasonable attorneys' fees and costs of investigation and litigation, as well as any other relief as authorized by statute.

## IX.

## FIFTH CLAIM FOR RELIEF
### [Fraud]

300. Plaintiffs incorporate by reference all the preceding paragraphs of this Complaint as if fully set for herein.

301. To assert a claim of fraud, a plaintiff must allege facts supporting each element of a fraud claim, including: (1) the false representation or concealment of a material fact, (2) that is reasonably calculated to deceive, (3) made with the intent to deceive, (4) that does in fact deceive plaintiff, and (5) results in damage to plaintiff.

302. Here, the fraud committed by Tony Azar, and Defendants, against the Plaintiffs, is enhanced by the duty owed by Tony Azar to the Plaintiffs because of the existence of a confidential or fiduciary relationship between them, *i.e.*, Tony Azar being the Sole Manager of Plaintiff TSPM, LLC. It is based on misrepresentations or

concealments of facts to Plaintiffs and consisted of taking an improper advantage of the fiduciary relationship at the expense of the Plaintiffs.

303. Under North Carolina General Statute, § 57D-3-21, which in pertinent part states, *the managers shall manage the LLC and conduct the LLC's business in accordance with the operating agreement … [e]ach manager shall discharge the person's duties, (i) in good faith, (ii) with the care an ordinary prudent person in a like position would exercise under similar circumstances ……."*

304. It has been alleged in this Complaint that Defendants continuously made numerous false statements to Plaintiffs that Plaintiffs would receive a 33% ownership interests in each of their investments, into the companies created, managed, and operated by Tony Azar and each and all Defendants.

305. Tony Azar, and Defendants, as fiduciaries, had a formal duty under the law to fully disclose all material facts about those investments to the Plaintiffs and do so in good faith.

306. Defendants did not disclose all material and true facts to the Plaintiffs about their investments as fully alleged in this Complaint.

307. Defendants, in fact, concealed material facts to the Plaintiffs about those investments as Defendants knew the falsity of those promises of 33% ownerships from the beginning.

308. Defendants were deliberately silent when they knew they had a duty to speak and to disclose materials facts about the true destiny of Plaintiffs' investments.

309. The false statements of material fact and concealment of material facts were reasonably calculated to deceived Plaintiff because Tony Azar, and Defendants, knew the Plaintiffs were ignorant of the true facts and did not have an equal opportunity to discover the truth.

310. The false statements of material fact and concealment of material facts were made with the intent to deceive Plaintiff.

311. Tony Azar, and Defendants, intended for the Plaintiffs to rely on the omissions and concealments.

312. Tony Azar, and Defendants, intended that the false promises of 33% ownerships in the companies induce Plaintiffs' reliance on those promises.

313. Plaintiffs were in fact deceived because they justifiably relied on those false promises to their complete detriment, as fully alleged in this Complaint.

314. Furthermore, Defendants abused the confidential and fiduciary relationship demanded of them and took an unconscionable advantage over the Plaintiffs.

315. Defendants' unlawful conduct has directly, legally, and proximately caused and continues to cause injuries to Plaintiffs in their business or property. Accordingly, Plaintiffs seek an award of damages from defendants.

## X.

## SIXTH CLAIM FOR RELIEF
### [Civil Conspiracy to Defraud]

316. Plaintiffs incorporate by reference all the preceding paragraphs of this Complaint as if fully set forth herein.

317. Defendants and each of them, combined and agreed with each other and/or others to defraud Plaintiffs by failing to disclose materials facts, by concealment of true facts, by abusing their mandatory duty to act in good faith toward Plaintiffs, by taking an unconscionable advantage of them, with the specific intent to induce Plaintiffs to contribute and/or invest their lawful funds into Defendants' illegal Enterprise.

318. This conspiracy began in the year 2012 and continuous to the present.

319. Pursuant to their agreement, Defendants, and each of them, acted in concert to support their common purpose of defrauding Plaintiffs of their lawful funds, to cause them to continue to contribute funds to Defendants.

320. Each Defendant committed an overt unlawful act or committed a lawful act in an unlawful way in furtherance of the conspiracy.

321. Each Defendant acted with the common intent to defraud Plaintiffs and understood that all other Defendants shared in that common purpose.

322. Defendants' conduct was willful, wanton, malicious and oppressive.

323. Defendants' unlawful conspiracy has directly, legally, and proximately cased and continue to cause injuries to Plaintiffs' business and property.

## XI.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs respectfully request that this Court:

1. Conduct a trial by jury on all issues.

2. Award compensatory, consequential, and punitive damages in an amount to be determined at trial.

3. Award injunctive relief pursuing to 18 U.S.C. Section 1964(a) by issuing orders to any person to divest himself of any interest, direct or indirect, in any enterprise, imposing reasonable restrictions on the future activities or investments of any person, including but not limited to, prohibiting any person from engaging in the same type of endeavor as the enterprise engaged in.

4. Award treble damages in an amount of $45,000,000.00.

5. Award pre-judgment and post-judgment interests.

6. Award reasonable attorneys' fees.

7. Award the costs of the lawsuit.

8. Award other relief as this Court may deem appropriate.

Respectfully submitted this 28th day of September 2021.


/s/ Edmundo Espinoza
EDMUNDO ESPINOZA
Post Office Box 809
Buda, Texas 78610
Telephone (214) 475-3015
espinozalawyers@gmail.com
Cal State Bar No. 64059

*Counsel for Plaintiffs*
*Pro Hac Vice Pending*

/s/ William R. Terpening
William R. Terpening
N.C. Bar 36418
**TERPENING LAW PLLC**
221 W. 11th Street
Charlotte, North Carolina 28202
terpening@terpeninglaw.com
(980) 265-1700

*Local Counsel for Plaintiffs*

64

## VERIFICATION BY DECLARATION
### [28 U.S.C. 1746]

I declare under penalty of perjury under the laws of the United States that the facts stated in this Civil Complaint are within my personal knowledge and are true and correct and that I executed this declaration in Miami-Dade County, State of Florida, on September 28, 2021.

*AVA Dis*

AVADIS AVADIS, declarant.